IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


KRYSTAL C. V. JOHN B.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


KRYSTAL C., INDIVIDUALLY AND ON BEHALF OF J.C. ET AL.,
MINOR CHILDREN, APPELLEES,

V.

JOHN B., APPELLANT.


Filed March 10, 2020.    No. A-19-767.


Appeal from the District Court for Burt County: JOHN E. SAMSON, Judge. Reversed and remanded with directions.

Nicholas E. Wurth, of Law Offices of Nicholas E. Wurth, P.C., for appellant.

No appearance for appellees.


MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

John B. appeals a domestic abuse protection order obtained by Krystal C., individually and on behalf of her minor children. Upon our de novo review of the record, we reverse and remand with directions to vacate the protection order.

## BACKGROUND

Krystal and John were in an on-and-off romantic relationship from 2014 or 2015 until sometime in April or May 2019. On May 28, 2019, Krystal filed a petition and affidavit to obtain a domestic abuse protection order for herself and her three children against John under Neb. Rev. Stat. § 42-924 (Cum. Supp. 2018). John is not the father of the children. An ex parte domestic abuse protection order was issued the following day. John requested a hearing on the matter

- 1 -

pursuant to Neb. Rev. Stat. § 42-925 (Cum. Supp. 2018) to show cause why the protection order should not remain in effect.

At the show cause hearing, the district court received Krystal's petition and affidavit into evidence. Krystal testified that the allegations contained in her affidavit were true and accurate and that she included the most recent concerning behaviors by John in the affidavit. In the affidavit, Krystal generally claimed that John was paranoid and would become physical and violent. She explained that at times he grabbed her arm or hand and "jerked" her down. On one occasion, he choked her in bed, which almost made her pass out and left bruises on her neck. She indicated that the following morning, he pulled her down to lay with him and grabbed her neck.

She also detailed a time where she and her children were at John's house, and she and John began arguing. In the affidavit she wrote that when she walked to the kitchen to get her children who were downstairs, she "ended up" downstairs. At the show cause hearing, Krystal testified that she "mistyped" when she wrote that she "ended up" downstairs and that she meant to say that John pushed her down the stairs. She said that she injured her hand from falling down the stairs and that after she and her children left John's house, she went to the police station but was too afraid to report what happened. She was cited for reckless driving because she had alcohol on her breath and had driven to the police station with her children in the car. She indicated in the affidavit that the incident occurred on November 28, 2018, but after viewing the ticket she received for reckless driving, she acknowledged that she was mistaken and that the incident had actually occurred on January 5, 2018. The ticket was received into evidence at the hearing.

The affidavit and Krystal's testimony also establish that John would repeatedly contact Krystal by text message, phone calls, social media, or by driving by her house. Copies of text messages between them were received into evidence. Krystal indicated that she was afraid of John and that he threatened her. At the time of the show cause hearing, Krystal had a new boyfriend, and he testified that he had seen John drive by Krystal's house. John admitted driving by Krystal's house, and he said he did so to see if anyone was at her house because he believed that she was seeing someone else while they were dating. However, John denied pushing Krystal down the stairs, grabbing her neck, threatening her, or ever causing her physical harm.

At the conclusion of the hearing, the district court stated that the matter came down to a credibility issue. The court noted that Krystal had some issues regarding the exact dates of things, but, given that some of her testimony was corroborated by text messages from John and her boyfriend's testimony, there was sufficient credible evidence to support her testimony. The court therefore extended the protection order for 1 year. John appeals.

## ASSIGNMENT OF ERROR

John assigns that the district court erred in affirming the ex parte domestic abuse protection order.

## STANDARD OF REVIEW

A protection order pursuant to § 42-924 is analogous to an injunction. Thus, the grant or denial of a protection order is reviewed de novo on the record. In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. However, where

the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Robert M. on behalf of Bella O. v. Danielle O.*, 303 Neb. 268, 928 N.W.2d 407 (2019).

## ANALYSIS

John first argues that the district court erred in affirming the domestic abuse protection order because the evidence presented at the hearing failed to establish that his actions constituted abuse within the meaning of Neb. Rev. Stat. § 42-903 (Cum. Supp. 2018). We disagree.

Any victim of domestic abuse may seek a domestic abuse protection order. § 42-924. Whether domestic abuse occurred is a threshold issue in determining whether an ex parte protection order should be affirmed; absent abuse as defined by § 42-903, a protection order may not remain in effect. § 42-924; *Robert M. on behalf of Bella O. v. Danielle O., supra*.

"Abuse" as used in § 42-903(1) means the occurrence of one or more of the following acts between family or household members:

> (a) Attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument;
>
> (b) Placing, by means of credible threat, another person in fear of bodily injury. . . . or
>
> (c) Engaging in sexual contact or sexual penetration without consent as defined in [Neb. Rev. Stat.] section 38-318 [Reissue 2016].

Family or household members include persons who have resided together in the past. § 42-903(3). Krystal testified that she and her children had previously cohabited with John.

The district court found that domestic abuse occurred as defined by § 42-903(1). Although the district court did not state which subsection of § 42-903(1) was met, we find the evidence was sufficient to prove that John intentionally and knowingly caused bodily injury under § 42-903(1)(a).

In the affidavit, Krystal wrote that on one occasion, John "choked [her] in bed almost making [her] pass out and left bruises on [her] neck." At the hearing she confirmed that everything she stated in the affidavit was true. She also testified regarding this incident, explaining that John had grabbed ahold of her neck and she could not breathe. The court asked if the incident she had described was included in her affidavit, and she said that it was. The district court found Krystal's testimony to be true, and in our de novo review of the record, we consider and give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Robert M. on behalf of Bella O. v. Danielle O., supra*. We therefore conclude that Krystal met her burden of proving that John intentionally or knowingly caused her bodily injury in order to establish that domestic abuse had occurred.

Our inquiry does not end here, however. And John argues that even if the evidence was sufficient to establish abuse, the scope, remoteness of abuse, and the relationship of the parties weigh in favor of a dismissal of the protection order because there is no reasonable likelihood of future harm.

The Nebraska Supreme Court has explained that when an ex parte domestic abuse protection order is issued and the respondent requests a show cause hearing, the inquiry before the district court at the hearing is whether the ex parte order ought to remain in effect after it was in place. *Maria A. on behalf of Leslie G. v. Oscar G.*, 301 Neb. 673, 919 N.W.2d 841 (2018). See, also, § 42-925(1). Whether domestic abuse occurred is a threshold issue in determining whether an ex parte protection order should be affirmed; absent abuse as defined by § 42-903, a protection order may not remain in effect. *Maria A. on behalf of Leslie G. v. Oscar G., supra*. But even when domestic abuse as defined by § 42-903 has occurred, the language of § 42-925(1) suggests a wider inquiry in deciding whether to affirm or rescind an ex parte protection order. *Maria A. on behalf of Leslie G. v. Oscar G., supra*.

Section 42-925(1) frames the issue as whether the protection order should remain in effect and thus orients the court's view toward the future and the goal of domestic abuse protection orders, which is to protect victims of domestic abuse from further harm. *Maria A. on behalf of Leslie G. v. Oscar G., supra*. In many, if not most, instances, a showing of abuse under § 42-903 is sufficient to merit the affirmation of an ex parte protection order; but it is not the only consideration in determining whether an ex parte protection order should remain in effect to prevent future harm. *Maria A. on behalf of Leslie G. v. Oscar G., supra*.

In addressing the question of whether to affirm an ex parte protection order, the district court is not guided exclusively by the definition of abuse in § 42-903 or by whether the ex parte order was permissible at its inception. See *Maria A. on behalf of Leslie G. v. Oscar G., supra*. Instead, the district court can also consider other factors in its determination as to whether the ex parte order should remain in effect to prevent future harm. *Id*. Those factors might include, but are not limited to, the remoteness, severity, nature, and frequency of past abuse; past or pending credible threats of harm; the psychological impact of domestic abuse; the potential impact on the parent-child relationship; and the nuances of household relationships. *Id*.

In *Maria A. on behalf of Leslie G. v. Oscar G., supra*, the Supreme Court concluded that the district court did not err in rescinding a domestic abuse protection order based on one incident of violence by a father against his daughter. The court acknowledged the significance of the violent incident, but noted that a protection order at the time of the show cause hearing could not have prevented that outcome and that the mother conceded that the daughter suffered no bodily injury as a result. The court further noted that the evidence did not show any pending threat of future harm or a pattern of abuse foreshadowing future harm.

Likewise, in *Ditmars v. Ditmars*, 18 Neb. App. 568, 788 N.W.2d 817 (2010), this court held that assuming without deciding that the wife's allegations in the petition and affidavit rose to the level of abuse contemplated by § 42-903(1), the incidents she alleged were too remote in time to support the extension of the domestic abuse protection order. We noted that the allegations involved incidents that had occurred several months prior to the filing of the petitions; that the wife filed the petitions in Nebraska, after she and her son had moved away from the husband; that neither the wife nor her son had any contact with the husband since they left the State of Kansas; and that the husband and wife were preparing to divorce.

To the contrary, in *Sarah K. v. Jonathan K.*, 23 Neb. App. 471, 873 N.W.2d 428 (2015), we affirmed an order granting domestic abuse protection orders pursuant to § 42-924, even though

the instances of alleged abuse were remote in time. We noted that neither § 42-903(1)(a) nor § 42-924(1) imposes any limitation on the time during which a victim of domestic abuse may file a petition and affidavit seeking a protection order. However, we acknowledged that the remoteness of past abuse may be considered by the court in deciding whether a protection order is warranted and that a remote incident of abuse may not always support the issuance of a domestic abuse protection order. We further recognized that different remedies are required when there has been an isolated act of abuse that is unlikely to recur, as compared to an egregious act of abuse preceded by a pattern of abuse. In concluding that the protection orders in *Sarah K. v. Jonathan K., supra*, were warranted despite the remoteness of the abuse, we reasoned that the petitioner had a present fear of future abuse due to the history and pattern of past abuse.

In the instant case, Krystal and John were in an on-and-off romantic relationship for 4 or 5 years. Krystal testified that she and John had lived together "a few years back." Their relationship ended around April or May 2019, and Krystal began dating someone new in May, a man she was still dating at the time of the show cause hearing in July. At the time of the hearing, Krystal was living in Craig, Nebraska, and John was living in Tekamah, Nebraska. Much of the evidence Krystal presented did not involve face-to-face contact, but, rather, related to persistent text messages, phone calls, messages sent via social media, and John driving by her house. While this evidence may be relevant in the context of a harassment protection order, it is not sufficient to prove the necessity of extending a domestic abuse protection order.

A trial court has discretion, authority, and jurisdiction to issue a harassment protection order, even though the petitioner had filed a petition for a domestic abuse protection order. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014). In the present case, however, Krystal did not ask the district court to consider entering a harassment protection order, and this court will not consider whether the district court should have instead issued a harassment protection order. See *id*. We therefore move on to consider the factors specifically enumerated in *Maria A. on behalf of Leslie G. v. Oscar G.*, 301 Neb. 673, 919 N.W.2d 841 (2018).

One of the factors the court can consider in deciding whether to affirm a domestic abuse protection order is the remoteness, severity, nature, and frequency of past abuse. Here, Krystal said that she included the most recent concerning behaviors by John in her affidavit. There are few specified dates in the affidavit, but considering the affidavit in conjunction with Krystal's testimony at the show cause hearing, we understand that she detailed an incident that occurred on January 5, 2018, where she alleged that John pushed her down the stairs at his house, causing injury to her hand. She also alleged an incident where John choked her in bed, which almost made her pass out and left bruises on her neck. It is unclear when this incident occurred, but after describing it in her affidavit, she wrote, "It was three weeks before talking to [John] again" and then detailed the stairs incident. Thus, it appears that the time John left bruises on Krystal's neck occurred approximately 3 weeks prior to January 5, 2018, or sometime in mid-December 2017. Krystal filed the petition for a protection order in May 2019.

Krystal otherwise did not detail any other specific instances that would constitute bodily injury under § 42-903(1). Rather, she generally alleged that John "would get more violent" or "became more physical." She also alleged that he would grab her arm or hand and "jerk" her down and that he grabbed her neck in front of her children. Although she never claimed that these

incidents caused bodily injury, they could be construed as an attempt to do so. It is unknown, however, when these instances occurred or how frequently.

John denied pushing Krystal down the stairs or ever causing her physical harm. However, the district court, although recognizing some issues with Krystal's credibility, generally found her to be credible. Where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Maria A. on behalf of Leslie G. v. Oscar G., supra*. Here, we give weight to the fact that the district court found Krystal's version of events to be credible.

Accordingly, the evidence establishes that there were two incidents of bodily injury, approximately 16 months prior to the filing of the petition, which resulted in Krystal sustaining an injured hand from John pushing her down the stairs and bruises from him grabbing her neck. There are other claims where it could be said that John attempted to cause Krystal bodily injury, but there is no evidence as to the timing, frequency, or severity of these incidents. Krystal testified that she included the most recent incidents in her affidavit; thus, we can infer that Krystal did not suffer any serious injuries from January 2018 until she filed the petition in May 2019. Therefore, when considering the remoteness, severity, nature, and frequency of past abuse, we find that this factor weighs in favor of rescinding the protection order.

The next factor to be considered is past or pending credible threats of harm. The Supreme Court has found that the term "credible threat" as related to § 42-903 means that the evidence at trial must include some threat of intentional physical injury or any other physical threat. See *Linda N. v. William N.*, 289 Neb. 607, 614, 856 N.W.2d 436, 443 (2014). "Morally abhorrent" text messages which contained "crude language and excessive name-calling" were deemed insufficient to establish credible threats of harm, even where the recipient felt threatened by the messages, because nowhere in the text messages was there any reference to physical harm, either occurring or threatened, nor was there evidence of any past physical abuse. *Id*.

In the present case, Krystal alleged in her affidavit that John sent her threatening text messages. She described them as "horrible things said, that would hurt. He would accuse me of being heartless, that I cheated, or even that I enjoyed hurting him." She detailed messages that she received in late April 2019, most of which refer to Krystal ignoring him and in which he claims he "know[s] whats [sic] going on." Attached to her affidavit were print outs of the messages and calls received over the prior 3 months. In them, John pines for her and laments his loss of her, but they contain no threats of physical harm.

When asked at trial about the threatening texts, Krystal referred to a text message from John dated April 26, 2019, where he asked, "Do I need to do a drive-by?" When asked why that message concerned her, Krystal said because John lived in Tekamah and she lived in Craig and there was no reason for him to be in Craig except to see her. She further stated that she was afraid he was going to barge into her house again and scare her and her children. On cross-examination, Krystal said that she perceived his "drive-by" reference to be a threat against her that he was going to harm her by either shooting her or that he was going to come to her house and hurt her. Krystal indicated in her affidavit that John owned firearms and was paranoid at times, making her fear that

he could be a threat. However, she never expressed that he threatened her or her children, nor does the record contain any evidence that John threatened her or her children, with or without a firearm.

Additionally, the surrounding evidence made clear that the reference to a "drive-by" in the text message referred to John driving by Krystal's house. John testified that his reference to a "drive-by" meant to "drive by [Krystal's] house and see if somebody was there" because he believed he and Krystal were still in a relationship and that she was being unfaithful to him. At the conclusion of the hearing, the district court stated that John acknowledged some "drive-bys" during the relationship, citing an April text message where John told Krystal that he was sitting outside her house, and the court found that Krystal's current boyfriend "confirmed the drive-bys" when he testified that Krystal would point out John to him when John would drive by Krystal's house. Driving by Krystal's house alone is insufficient to establish a credible threat of harm when no threat of physical harm was ever made, and there was no evidence that during these drive-bys John ever made any contact with Krystal, got out of his vehicle, or had a firearm in his possession.

The district court also found that there were "certainly harsh, to the verge of threatening, text messages" sent in April and May. The specific messages to which the court referred contained crude language and made clear that John was upset that his relationship with Krystal was over, but they did not contain any references to physical harm or any indication that John was planning to take any physically threatening action against Krystal. As such, the record lacks evidence of past or pending credible threats by John against Krystal that would have placed her in fear of bodily injury. The court acknowledged that they were "to the verge of threatening," not that they were threatening. This factor therefore does not support extending the protection order.

Evidence of the psychological impact of domestic abuse is another factor that can be considered. In her affidavit, Krystal wrote that she was "terrified of what [John] will do if [she] ran into him" and that "[i]t has been exhausting being terrified of what [John] would do if [she] ran [into] him." She also testified that her children are afraid of John's behavior and that she just wants peace. Accordingly, we find that this factor weighs in favor of affirming the protection order.

The next factor is the potential impact on the parent-child relationship. This factor is not applicable here because John is not the father of Krystal's children; thus, the protection order would have no impact on a parent-child relationship.

Finally, we consider the nuances of household relationships. This factor does not weigh in favor of extending the protection order because Krystal and John are no longer cohabiting, have no children together, and Krystal is in a new relationship.

We emphasize that in protection order matters, our review is de novo on the record. Where credible evidence was in conflict on a material issue of fact, we gave weight to the district court's acceptance of Krystal's testimony rather than John's. See *Robert M. on behalf of Bella O. v. Danielle O.*, 303 Neb. 268, 928 N.W.2d 407 (2019). Even so, pursuant to our standard of review, we reach an independent conclusion of whether those facts support extending the protection order. Under the facts of this case and given our standard of review, we conclude that upon consideration of the factors expressed by the Supreme Court it was not necessary to keep the domestic abuse protection order in place to prevent future harm.

As we observed above, much of the evidence Krystal presented did not involve conduct that would satisfy the definition of domestic abuse; rather, it was related to persistent unwanted

contact from John in the form of repeated text messages, phone calls, messages sent via social media, and John driving by her house. Our conclusion here is not to say that Krystal is not warranted in seeking to prevent John from continuing this behavior. However, while the evidence Krystal presented may be relevant in the context of a harassment protection order, an issue we do not decide here, it is not sufficient to prove the necessity of extending a domestic abuse protection order. We therefore reverse the judgment of the district court, and remand the cause with directions to vacate the protection order.

CONCLUSION

Upon our de novo review, we conclude that the district court erred in extending the domestic abuse protection order. We therefore reverse the judgment and remand the cause with directions to vacate the order.

REVERSED AND REMANDED WITH DIRECTIONS.